COURT OF APPEALS
DECISION
DATED AND FILED

March 28, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1679**

STATE OF WISCONSIN

Cir. Ct. No. 2013PR12

IN COURT OF APPEALS
DISTRICT IV

IN RE THE ESTATE OF KATHERINE A. FARGEN:

THE ESTATE OF KATHERINE A. FARGEN,
RONALD RIPLEY AND JOANNE RIPLEY,

    RESPONDENTS,

  V.

THOMAS G. FARGEN AND JEAN FARGEN,

    APPELLANTS.

APPEAL from an order of the circuit court for Sauk County: WENDY J.N. KLICKO, Judge. *Affirmed.*

Before, Kloppenburg, P.J., Blanchard, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   Thomas G. Fargen ("Thomas Jr.") and Jean Fargen (collectively, "the junior Fargens") appeal a circuit court order dismissing their unjust enrichment claim against the Estate of Katherine A. Fargen and Ronald and Joanne Ripley (collectively, "the Estate").  The court concluded that the Estate met its burden of establishing that the junior Fargens' claim is barred by the equitable doctrine of laches.  For the reasons stated below, we affirm the court's order.

## BACKGROUND

¶2    The following factual background is derived from evidence presented at trial, primarily Thomas Jr.'s trial testimony, and is undisputed for purposes of this appeal.

¶3    Thomas  H.  Fargen  ("Thomas  Sr.")  and  Katherine  Fargen (collectively, "the senior Fargens") owned a 180-acre dairy farm.  The senior Fargens had four children, the oldest of whom is Thomas Jr.  Thomas Jr. is married to Jean Fargen.

¶4    Thomas Jr. left the farm in 1968 after graduating from high school, but by 1975 he had moved back and was helping the senior Fargens operate the farm.

¶5    Thomas  Jr.  testified  that  in  1977,  Thomas  Sr.  agreed  to  sell Thomas Jr. the farm, "lock, stock, and barrel for $60,000."  They made the agreement orally, at night in the barn while they were milking, with no one else present.  They also agreed that, initially, Thomas Jr. would continue to live on and help operate the farm and that Thomas Jr. would receive 30 percent of the farm's income.  Of the 70 percent of the farm's income that the senior Fargens would retain under the agreement, whatever remained after accounting for the farm's

operating expenses would count toward Thomas Jr.'s purchase of the farm. Thomas Jr. testified that Katherine "was going to take care of the books, and after she took out the bills and stuff that had to be paid, like the farm gas, the taxes, the stuff like that, whatever was left, then that would go towards the farm out of the 70 percent they were getting."

¶6     The division of the farm's income that the junior Fargens received increased over time, and by 1990 they were receiving 80 percent of the farm's profits. On at least one occasion, the increase was prompted by the junior Fargens' expressed dissatisfaction with the division of labor and with how much of the farm's income they were receiving.

¶7     Thomas Jr. testified that he had frequent disagreements with the senior Fargens about committing the 1977 agreement to writing. He testified, "[There] were arguments because I'd want [the senior Fargens] to put something in writing. They'd promise to do it. They would never do it. They would just sit back and they'd say that their word was good." At some point, the junior Fargens learned that Katherine had not been keeping track of how much was being put toward the junior Fargens' purchase of the farm out of the portion of the farm's income that the senior Fargens were keeping.[1]

¶8     Katherine stopped working on the farm in 1980 or 1981, and Thomas Sr. stopped working on the farm around 1985. The senior Fargens moved off the farm in 1985 or 1986.

---

[1] It is not clear from Thomas Jr.'s testimony when he learned that Katherine had not been keeping track of the payments.

¶9     In 2006, Thomas Sr. died. Prior to his death, in 2002, Thomas Sr. told Thomas Jr. that he would leave the farm to the junior Fargens in his will. In fact, Thomas Sr.'s will left all of his property to Katherine. According to the will, if Katherine predeceased Thomas Sr., then the junior Fargens would have received 140 of the farm's 180 acres, which would have included the farm residence, the farm buildings, and all the farmland.

¶10     According to Thomas Jr., at some point prior to Thomas Sr.'s death, Katherine told Thomas Jr. that Thomas Sr. would likely precede her in death, in which case she "would make sure [that the junior Fargens] got the farm." After Thomas Sr.'s death, however, Katherine told Thomas Jr. that she did not intend to leave the junior Fargens the entire farm. Thomas Jr. testified that Katherine told Thomas Jr. that "the other kids wanted" the farm and that she "wanted them to have it."

¶11     Also after Thomas Sr.'s death, Thomas Jr. had a disagreement with his family about the content of Thomas Sr.'s obituary. Thomas Jr. testified, "[T]hat was about the end of my relationship with my mother."

¶12     In 2006 or 2007, Thomas Jr. consulted with an attorney about pursuing his claim to the farm. Thomas Jr. decided not to pursue the claim. He testified, "It was to the point that I would have had to sue my mother, and where I come from, you don't sue your 80-year-old mother."

¶13     Katherine died in 2012. She did not leave the entire farm to the junior Fargens; instead, her will left them 15 acres. The rest of the farm was divided between her other surviving children.

¶14    In 2013, the junior Fargens filed a claim against Katherine's estate for "[s]pecific performance of oral contract to sell [the farm] to claimants." They then filed an amended complaint, which is the operative complaint for purposes of this appeal, alleging claims for breach of contract and unjust enrichment, and seeking an award of the farm or its fair market value.

¶15    The case was tried before a jury. The jury found that a contract existed and that the senior Fargens were unjustly enriched. After the trial, however, on the Estate's motion, the circuit court concluded that any contract was unenforceable under the statute of frauds, and the court dismissed the junior Fargens' contract claim. *See* WIS. STAT. § 706.02 (2021-22)[2] (requiring transactions that create an interest in land to be evidenced by a conveyance that identifies the parties, the land, and the interest conveyed). The jury determined "the reasonable value of the benefit conferred" upon the senior Fargens to be "[t]he Fargen senior family farm of 181.5 acres." The court "adopt[ed] [this] as its own judgment" and awarded the farm to the junior Fargens. Questions were also submitted to the jury regarding the application of laches, which the circuit court "adopt[ed] as its own judgment." Consistent with the jury's responses to those questions, the court did not apply laches.[3]

¶16    The Estate appealed the circuit court's decision. ***Estate of Fargen v. Fargen***, No. 2018AP1818, unpublished slip op. (WI App Apr. 30, 2020). The

---

[2] All references to the Wisconsin Statutes are to the 2021-22 version.

[3] Unjust enrichment and laches are both equitable doctrines. ***Abbott v. Marker***, 2006 WI App 174, ¶20, 295 Wis. 2d 636, 722 N.W.2d 162 (unjust enrichment); ***Wisconsin Small Bus. United, Inc. v. Brennan***, 2020 WI 69, ¶11, 393 Wis. 2d 308, 946 N.W.2d 101 (laches). "The verdict of a jury in an equity case is merely advisory." ***Cram v. Bach***, 1 Wis. 2d 378, 381, 83 N.W.2d 877 (1957).

Estate argued "that the circuit court failed to provide an adequate basis to explain why the senior Fargens were unjustly enriched by the approximate value of, or by the senior Fargens' possession of, the entire farm," and "that the court failed to consider its laches defense." *Id.*, ¶4. We agreed, and reversed and remanded. *Id.*, ¶5. We directed the court to resolve the issues "as appropriate, demonstrating [an] independent exercise of discretion based on relevant evidence and pertinent legal standards." *Id.*

¶17 On remand, the circuit court ruled that the junior Fargens' unjust enrichment claim is barred by laches.[4] The junior Fargens appeal.[5]

## DISCUSSION

¶18 The junior Fargens argue that their unjust enrichment claim is not barred by laches. For the reasons that follow, we affirm the circuit court's order.

¶19 "[A]n action for unjust enrichment, or quasi contract, is based upon proof of three elements: (1) a benefit conferred on the defendant by the plaintiff,

---

[4] As a result, the circuit court did not need to address the issue relating to the proper award for the junior Fargens' unjust enrichment claim. *See Estate of Fargen v. Fargen*, No. 2018AP1818, unpublished slip op. ¶5 (WI App Apr. 30, 2020) (noting that "if the circuit court were to determine that the Estate has a valid laches defense, then the court would not need to address whether the senior Fargens were unjustly enriched by any particular amount or what the proper remedy is").

[5] The Estate's brief does not comply with WIS. STAT. RULE 809.19(8)(bm), which states that, when paginating briefs, parties should use "Arabic numerals with sequential numbering starting at '1' on the cover." This rule was amended in 2021, *see* S. CT. ORDER 20-07, 2021 WI 37, 397 Wis. 2d xiii (eff. July 1, 2021), because briefs are now electronically filed in PDF format and are electronically stamped with page numbers when they are accepted for e-filing. As our supreme court explained in amending the rule, the pagination requirement ensures that the numbers on each page of the brief "will match … the page header applied by the eFiling system, avoiding the confusion of having two different page numbers" on every page of a brief. S. CT. ORDER 20-07 cmt. at x1.

(2) appreciation or knowledge by the defendant of the benefit, and (3) acceptance or retention of the benefit by the defendant under circumstances making it inequitable for the defendant to retain the benefit." *Watts v. Watts*, 137 Wis. 2d 506, 531, 405 N.W.2d 303 (1987).

¶20 "Laches is an affirmative, equitable defense designed to bar relief when a claimant's failure to promptly bring a claim causes prejudice to the party having to defend against that claim." *Wisconsin Small Bus. United, Inc. v. Brennan*, 2020 WI 69, ¶11, 393 Wis. 2d 308, 946 N.W.2d 101. There are three elements to a laches defense: "(1) a party unreasonably delays in bringing a claim; (2) a second party lacks knowledge that the first party would raise that claim; and (3) the second party is prejudiced by the delay." *Id.*, ¶12. "The party seeking application of laches bears the burden of proving each element." *Id.* Even when these elements have been met, a court may, exercising its discretion, choose not to apply laches if it determines that doing so would be inequitable. *Id.*

¶21 We independently review whether the elements of laches have been met. *Zizzo v. Lakeside Steel & Mfg. Co.*, 2008 WI App 69, ¶6, 312 Wis. 2d 463, 752 N.W.2d 889. When they have, we review the circuit court's decision to apply laches for an erroneous exercise of discretion. *State ex rel. Wren v. Richardson*, 2019 WI 110, ¶16, 389 Wis. 2d 516, 936 N.W.2d 587.

¶22 We conclude that each of the elements of laches has been met and that the circuit court did not erroneously exercise its discretion when applying laches to bar the junior Fargens' unjust enrichment claim.

### I. Unreasonable Delay

¶23    Whether a delay is reasonable is a case-specific inquiry that considers the totality of the circumstances.  *Id.*, ¶18.  "[U]nreasonable delay in laches is based not on what litigants know, but what they might have known with the exercise of reasonable diligence."  *Id.*, ¶20.  The "delay clock" starts running when a party knows or should know that the party has a potential claim.  *Id.*, ¶21.

¶24    Here, we need not determine exactly when the delay clock began running; it is enough to note, as the circuit court did, that the evidence showed that the junior Fargens knew or might have known with the exercise of reasonable diligence that they had a claim by 2006 or 2007.  By 2006, Thomas Sr. had died and left the farm to Katherine, and by either 2006 or 2007, Katherine had told Thomas Jr., according to Thomas Jr.'s own testimony, that Katherine did not intend to leave the junior Fargens the entire farm.  Additionally, Thomas Jr. testified that by 2007 he consulted with an attorney about pursuing his claim to the farm, and he decided not to.  By 2007, then, the junior Fargens knew or might have known with the exercise of reasonable diligence that they had a claim.[6]

¶25    Katherine died in 2012, and the junior Fargens did not file their claim against her estate until April 2013, which means that the junior Fargens knew or might have known with the exercise of reasonable diligence for at least

---

[6] We note that there is evidence that could support a determination that the junior Fargens knew or might have known with the exercise of reasonable diligence that they had a claim earlier:  in their complaint, they allege that "[b]y the early 1990s, the purchase price had been paid and the [senior] Fargens were no longer doing any significant amount of work on the farm."  If the delay clock did begin to run by the early 1990s, then Thomas Sr.'s promise in 2002 that the junior Fargens would receive the farm when he died might bear on the reasonableness of the junior Fargens' delay.  By 2007, however, the junior Fargens knew that Thomas Sr. had not left them the farm, and that Katherine did not intend to leave them the entire farm.

six years that they had a claim, but they chose not to pursue it until after Katherine died. Under the circumstances of this case, this delay was unreasonable.

¶26 The junior Fargens argue that it was reasonable to expect that Katherine would change her mind and leave them the farm, despite her expressed intent not to do so. They direct us to Thomas Jr.'s testimony that Katherine told him that the junior Fargens would not receive the farm only after Thomas Jr. and Katherine had a disagreement about the content of Thomas Sr.'s obituary, and that she had earlier promised that the farm would ultimately go to the junior Fargens.

¶27 The record does not support the junior Fargens' argument that it was reasonable to expect that Katherine would change her mind. Thomas Jr. did testify that Katherine told him that she did not intend to leave the entire farm to the junior Fargens after a disagreement following Thomas Sr.'s death. As Thomas Jr. described it, however, this disagreement effectively "end[ed] … [his] relationship with [his] mother." Accordingly, based on Thomas Jr.'s own testimony, there was no reason for the junior Fargens to expect that Katherine would not act consistently with what she had said. She did not, as the junior Fargens' argument seems to suggest, disavow her earlier promise in a short-lived disagreement that soon blew over. The circuit court noted that by 2006 Thomas Jr.'s relationship with Katherine "was broken." The court further determined:

> The junior Fargens consulted counsel at that time with all of the information that they would have had about their claims; but they waited until after Katherine died, hoping somehow that she would have made a different decision and have changed her will and left the entire farm to them, such as would satisfy their unjust enrichment claim.
>
> However, … [it] is not reasonable under the circumstances for the junior Fargens to have expected that of Katherine. First, she, to their testimony, indicated that

9

she was not going to bequeath the entire farm, and then there was a nonexistent relationship between the parties.

The record amply supports the court's determination that it would have been unreasonable to expect that Katherine would change her mind.

¶28 The junior Fargens also argue that they had no way of knowing whether Katherine would leave them the farm in her will until after she died and they could see this confirmed in her will. But Katherine told them that she did not intend to leave them the farm, and the junior Fargens have not identified any persuasive reason to expect that Katherine would do otherwise.

*II. Lack of Knowledge*

¶29 For laches to apply, the party asserting laches must show that it lacked knowledge that the other party would assert the right on which the suit is based. *State ex rel. Coleman v. McCaughtry*, 2006 WI 49, ¶20, 290 Wis. 2d 352, 714 N.W.2d 900.

¶30 Here, there is no evidence that the senior Fargens knew that the junior Fargens intended to pursue the unjust enrichment claim that they eventually initiated after Katherine's death. Neither of the junior Fargens testified that they notified the senior Fargens of their intent to bring an unjust enrichment claim (or any claim, for that matter). Indeed, Thomas Jr. himself testified that they did not intend to bring a claim while Katherine was alive. As noted earlier, Thomas Jr. testified that in 2006 or 2007 he consulted with an attorney and learned that to pursue his claim to the farm, he would have had to sue Katherine, which he was unwilling to do. Specifically, he testified, "It was to the point that I would have had to sue my mother, and where I come from, you don't sue your 80-year-old mother."

¶31 The junior Fargens argue generally that the senior Fargens were aware of the facts underlying the junior Fargens' unjust enrichment claim. It is not enough, however, that the party asserting laches knew of the facts underlying a claim—the party asserting laches must have known that a claim would be brought. *See, e.g.*, *id.*, ¶28 (listing the second laches element as "lack of knowledge (that the claim would be brought)"); *Zizzo*, 312 Wis. 2d 463, ¶7 (identifying the second element as a lack of knowledge "that a claim for relief was forthcoming"); *Trump v. Biden*, 2020 WI 91, ¶23, 394 Wis. 2d 629, 951 N.W.2d 568 ("The second element of laches requires that the respondents lacked knowledge that the Campaign would bring these claims."); *Brennan*, 393 Wis. 2d 308, ¶18 (stating that laches did not apply because "the respondents … had no advance knowledge or warning of this particular claim").

¶32 The junior Fargens argue that in the circuit court the Estate "did not point to any facts upon which the circuit court could have concluded that Katherine Fargen was in fact 'unaware of any potential claim.'" Before the circuit court, however, the Estate identified the same facts that we rely on here—that Thomas Jr. testified that he did not intend to pursue the junior Fargens' claim to the farm while his mother was alive, and that the junior Fargens did not testify that they ever notified the senior Fargens of their intent to bring a claim.

¶33 The junior Fargens may mean to argue that relying on the fact that the junior Fargens did not testify that they ever notified the senior Fargens of their intent to bring their unjust enrichment claim improperly shifts the burden of proof. This lack of relevant testimony, however, is significant because Thomas Jr. testified that he did not intend to bring the claim while Katherine was alive. In other words, it is not the lack of relevant testimony from the junior Fargens, alone, that satisfies the lack-of-knowledge element—it is the lack of testimony paired

with Thomas Jr.'s statement about his intentions. Relatedly, the junior Fargens argue that it is a "leap in logic" to infer that the senior Fargens were unaware that the junior Fargens would sue them based on "Thomas Jr.'s testimony at trial that he consulted with an attorney regarding his rights but did not immediately pursue a lawsuit against Katherine." But this overlooks Thomas Jr.'s testimony that, after consulting with an attorney, he did not intend to pursue his claim to the farm at that time because it would require him to sue his mother. From this it is reasonable to infer that Thomas Jr. never notified Katherine of an intention to bring a lawsuit against the Estate. Indeed, the junior Fargens do not argue that they informed Katherine or anyone else of such an intent. Instead, they merely argue that the "circumstances" of the claim were known, which, as noted above, is insufficient to satisfy this element of laches.

### III. Prejudice

¶34    "'What amounts to prejudice, such as will bar the right to assert a claim after the passage of time pursuant to laches, depends upon the facts and circumstances of each case, but it is generally held to be anything that places the party in a less favorable position.'" **Wren**, 389 Wis. 2d 516, ¶32 (quoted source omitted).

¶35    The Estate argues that it was prejudiced because the junior Fargens' claim was not brought until after the senior Fargens' deaths. The Estate argues that, as a result, the senior Fargens were not available to testify about the alleged oral agreement or about how much value they had received from the junior Fargens.

12

¶36    We agree that this constitutes prejudice.  Indeed, "[t]he loss of key records and the unavailability of essential witnesses are 'classic elements' of prejudice in a laches defense."  *Id.*, ¶34 (quoted source omitted).

¶37    The junior Fargens argue that the Estate has failed to show prejudice because it has not "explained what evidence might have been presented."  This argument, however, was rejected by our supreme court in *Wren*.  There, Wren filed a habeas petition that alleged ineffective assistance of appellate counsel.  *Id.*, ¶¶1, 7.  In response, the State asserted laches, and "rest[ed] its case on the fact that the attorney who made the alleged missteps [had] passed away …, and no case files or notes remained."  *Id.*, ¶1.  In arguing that the State had not established the element of prejudice, Wren pointed to the circuit court's findings that Wren believed that the attorney would file an appeal on his behalf but that the attorney did not respond to attempts to contact him.  *Id.*, ¶35.  Wren argued that if those findings were accepted, any contradictory hypothetical evidence would be immaterial.  *Id.*, ¶36.  In responding to this argument, our supreme court concluded, "It is no excuse to say that we do not know what testimony [the attorney] would have offered, or what evidence his case files may have contained."  *Id.*, ¶37.  The unavailability of the attorney's files and testimony that resulted from Wren's delay was "the very definition of prejudice."  *Id.*, ¶36.[7]

---

[7] The junior Fargens argue that *State ex rel. Wren v. Richardson*, 2019 WI 110, 389 Wis. 2d 516, 936 N.W.2d 587, is distinguishable because, unlike in *Wren*, here "the Estate has made no claim that, by virtue of the Senior Fargens' unavailability, all other evidence upon which the Estate could rely in defense of the Fargens' claim was also unavailable."  However, in *Wren* our supreme court "stress[ed]" "that prejudice to a party for purposes of laches does not mean a party is so disadvantaged that it cannot prosecute its case.  The prerequisite under our law is prejudice due to the delay, i.e., disadvantage to a party."  *Id.*, ¶38.

¶38 In ***Zizzo***, 312 Wis. 2d 463, we similarly rejected an argument analogous to the one raised here by the junior Fargens. In ***Zizzo***, a son inherited mortgaged property from his parents, who had never made a payment on that mortgage. ***Id.***, ¶1. More than a decade after the last payment was due, and after his parents had died, the son sought to discharge the mortgage by asserting laches. ***Id.*** We stated that "[i]f [the mortgage holder] means to say that [the son's] prejudice claim is speculative because he does not know exactly what information his parents possessed, then [the mortgage holder] misunderstands defense prejudice. *Of course* [the son] does not know that information—and that is exactly how he is prejudiced." ***Id.***, ¶20 (emphasis in original).

¶39 Accordingly, consistent with ***Wren*** and ***Zizzo***, we conclude that the prejudice element was satisfied here.

*IV. Discretion*

¶40 We next address whether the circuit court erroneously exercised its discretion by applying laches. "Even if all three elements are satisfied, application of laches is left to the sound discretion of the court asked to apply this equitable bar." ***Brennan***, 393 Wis. 2d 308, ¶12.

¶41 The junior Fargens argue that applying laches would be inequitable; however, their argument fails to adequately account for this court's standard of review. We review for an erroneous exercise of discretion, and will affirm the circuit court's decision "as long as the court applied a proper standard of law and employed a demonstrated, rational process to reach a conclusion that a reasonable court could reach." ***Wren***, 389 Wis. 2d 516, ¶39.

¶42 We conclude that the circuit court did not erroneously exercise its discretion. After determining that all the elements of laches had been met, the court considered, under "the equities of the case," whether "the court should choose to not apply the defense." The court explained that it "only ha[d] before it the junior Fargens' testimony of what happened between them and the senior Fargens … over the course of 30 years." It further explained,

> In looking at that [testimony] alone, the equities of the case would certainly tip in the junior Fargens' favor. Working for many years for the promise of an entire farm to only potentially inherit a portion would seem an inequity. As tempting as that might be to do, the defense of laches and the resulting prejudice to the estate is that the court was rendered unable to hear both sides and to make a determination of fairness. Does it seem a harsh result to be promised something by parents, potentially lied to over and over and then not receive that? The answer would be yes. But it is equally harsh or unfair if the controversy could not be fully tried to the court to make those determinations, again, because of an unreasonable delay which resulted in prejudice to the estate and the inability of the court to have all of the information presented.

The court's ruling shows that the court applied the proper legal standard, used a demonstrated and rational process, and reached a result that a reasonable court could reach.

## CONCLUSION

¶43 For the reasons stated above, we affirm the circuit court's order.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.